### THE FRANK K. ESHERICK.

### THE MARS.

(Circuit Court of Appeals, Fourth Circuit. July 22, 1908.)

#### No. 767.

COLLISION—STEAMER AND TOW OF MEETING TUG—NEGLIGENT NAVIGATION OF TUG AND TOW.

A collision at a bend in the Pasquotank river between a barge in tow of a tug passing up around the bend, which was on their starboard side, and a descending steamer, *held* due solely to the fault of the tug and barge in failing to so navigate as to keep the barge on its own side of the river; it being conceded that the passing itself at that point was usual and proper, the river being from 125 to 150 feet wide, and the preponderance of the evidence showing that the steamer was as close to the right bank as she could get.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, § 80.]

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk.

J. W. Wilcox, for appellants.
Floyd Hughes, for appellee tug.
Edward R. Baird, Jr., for appellee barge.

Before PRITCHARD, Circuit Judge, and McDOWELL and DAYTON, District Judges.

DAYTON, District Judge. On August 1, 1906, a collision occurred between the steamer Thomas Newton and the barge Mars, in tow of the tug Frank K. Esherick, in a bend a little below Sawyer's Wharf,

in the Pasquotank river, in North Carolina. The hour was about 7 p. m., the weather was clear, and the waters high from recent heavy rains. At the time the steamer was descending the river on its way from Norfolk, Va., to Elizabeth City, N. C. The tug and barge were ascending the river on their way to Norfolk. Just above Sawyer's Wharf or landing a bend in the river occurs, followed by a reach of some 700 or 800 feet, followed by another bend to the left, when descending the river, where the collision occurred. The width of the river in this last bend is from 125 to 150 feet. The steamer was a wooden vessel 96 feet long, with a beam of 16 feet, and of about 39 tons burden. The tug was 68 feet, with 17-foot beam, and of about 66 tons burden. The barge was 150 feet long and with a beam of 23 feet. The steamer had on board a cargo of 150 barrels of lime, 40 barrels of flour, 350 bushels of corn, a quantity of household goods, and a number of passengers. The results of the collision were the sinking of the steamer and the burning of her upper works by reason of the action of the water on the cargo of lime. This libel was filed August 2, 1906, by appellants in the court below, claiming that the collision was due to the incompetency of those in charge of the tug and barge, their failure to keep the barge upon her side of the river, and towing with a hawser of too great length. The masters of the tug and barge filed answers, substantially the same, to the effect that the collision was due to the fact that the steamer, instead of keeping to its side of the river, ran down the center of the channel at too great speed. The court below, after hearing the evidence, on March 6, 1907, held the collision arose solely because of the negligence of the navigator of the steamer, and dismissed the libel, with costs.

In our view of the case it will not be necessary to discuss to any great extent several of the questions so ably and earnestly argued by counsel on both sides. The legal rule that the decision of the court below is not to be disturbed unless clearly against the weight of the evidence may be taken for granted. The technical rules of common-law pleading do not prevail in admiralty, and we may therefore dismiss the objections made on the grounds that the libel did not specifically enough set forth certain particular acts of alleged negligence proven on the trial, such as the failure to blow bend' and danger whistles, and that it did not set forth the condition of the current. All these matters were considered by the court below, its decree determined several of them, and, as we will hereinafter indicate, several of them were matters immaterial to the true solution of the issue.

Much of the argument of counsel on both sides is devoted to the question as to which, under the circumstances, was the "incumbered vessel" and entitled to the right of way. On the one hand, it is insisted that the steamer was the descending vessel in a swollen river, with an unusual swift current, and entitled under the rules to the right of way. On the other hand, it is insisted that although the tug was the ascending vessel, yet, it having the barge in tow, became the "incumbered vessel," and in consequence the steamer was legally bound, not only to avoid collision, but also the risk of collision with it. After careful consideration, we are entirely satisfied that this rule that the unincumbered vessel must avoid both collision and risk thereof with

the incumbered one is right. It is in fact so well settled now that it admits of no question. At the same time the determination of what makes a vessel "incumbered" cannot be reduced to a mathematical demonstration. It could not be insisted that a battleship ascending a river should be held, as against a passenger steamer descending, an "incumbered" vessel, because of the fact that it was towing its steam launch behind it. Each case must be governed by its own peculiar conditions, and the ascertainment of which in fact is the greatest incumbered, not alone by its tow, but by other conditions, must depend upon those peculiar conditions. In this case, after sifting the testimony, it would seem to us the conditions would make it here very hard to determine which was incumbered. The captain of the tug says she was capable of towing in these waters seven barges. She had but one. With it he was ascending the river around a gradual bend with three or four times the horse power of the steamer. On the other hand, the steamer was loaded rather heavily, and was unquestionably greatly affected by the unusual current. But it seems to us clear that it is not necessary or material for us to determine which was the incumbered one; for in our view the application of the rule cannot be made, for this reason: All testimony agrees that it was perfectly legitimate and proper for these vessels to pass each other in this and other like bends of this river, and that it was constantly done. Cahoon, captain of the steamer, says: "We always have been doing it." Capt. Whitehurst, in answer to the question: "Is it not a fact that passenger steamers, in meeting these tugs and tows, are passing and meeting them continually in the bends of that river?"—answered: "Yes, sir; everwhere, night and day. I have been running there from one to five times a week, six or seven years." Capt. Richardson says it is "a common occurrence." Dryden, captain of the tug, repeatedly says there was plenty of room to pass, that he had repeatedly passed towboats and barges in these bends, and had never had any trouble passing round them, and that it was not the determination to pass that was wrong or negligent on the part of the steamer, but solely the manner in which she undertook to make the passage. Common sense and observation teach us that danger, more or less, attends all navigation, as it does many other pursuits in life. They also teach us that navigation of such waters as these would be almost completely stopped if, crowded with vessels ascending and descending, one or the other, in passing, should be compelled to stop and tie up in order to "avoid collision or the risk of collision."

The parties themselves, both in pleadings and proofs, have practically narrowed this issue down to the single question of which one was negligent in effecting this passing, or, in other words, failed to keep on his own side. Dryden, master of the tug, in answer to the question: "That is what you consider the collision due to entirely, the Newton's failure to keep to the right hand side of the bank, and not because she should not have attempted to pass the barge at the point where she did attempt to pass it?"—answers: "Yes; I contend that if he had kept to the side, he would have gone through all right." This he reiterates many times in his testimony, and this statement is in complete accord with the defense set up in the answers to the libel. To support

this defense he testifies emphatically: "And, instead of keeping to the starboard side, which he blowed for, he did not do it, but kept deliberately down the middle." He says she was coming down very fast, in the center of the stream, if anything on his side, and "as the boat drew up nearer Capt. Cahoon was sitting in a chair, and the deck hand, I suppose, at the wheel, and he was smoking a cigar, and as he passed me he said, 'Hey, Captain,' and that is all I heard until I heard his bells." In support of this Davis, assistant engineer of the tug in answer to the question: "Where was she [the Newton] in the river then?"—answered: "Looked to me like about the middle of the river." And again he says: "They kept very near the middle of the river, I suppose under one bell." Sayers, master of the barge, in answer to the question: "The collision occurred just as she [the barge] was coming round the bend?" says: "She was then turning. The motion of her head was almost unnoticeable." In answer to the question: "I mean at what point with reference to the middle of the river, we will say, for the purpose of making the question clear, was the position of the barge?" he says: "I should think the extreme bow, from the stem of the barge, might have been a few feet beyond the middle of the river"—and, further "The steamer drifted right broadside into the barge as near as I can remember." In answer to another question, he stated that he had for 15 hours at the time been in the pilot house.

In contradiction of this contention, Cahoon, master of the steamer, contends that he saw the pilot house of the barge first, gave the one blast passing whistle, received from the tug its reply of one blast, took the starboard side so close to the bank "as to rub the bushes along the side," having reduced speed so that he was going with the current and two miles per hour in addition, or about five miles per hour; that had he reduced below this the current would have rendered his boat unmanageable, and had he stopped and backed she would have gone into the woods; that the barge at the point of the bend, instead of turning, went straight across the stream and struck the steamer on her port bow some 10 or 12 feet from her stem. In this contention he is very clearly sustained by the evidence of Lester, engineer on the Newton, who says, "We were lying on the starboard side, so near that the bushes were brushing down on our house;" by Aubison, a boatman on her, who says they were on the left hand side, "just as close [to the bank] as she could get"; by Dixon, a deck hand on the steamer, who says, "The trees was [were] brushing it [her];" by Gregory, a farmer and passenger on the Newton, who in answer to the question, "How close was the bow of the Newton to the bank when the barge struck her?" says, "It was very near. I was on the left-hand side or corner of the pilot house, and I did not notice. We were very near the bank, probably as near as we can be;" and by Pell, another passenger, who says, "Then the Newton began to slow her speed after she blew the last whistle, and she was moving along right slow near the right-hand side;" by Harrison, a deck mate on the Newton, who says, "She went close enough to strike the bushes;" by Puckett, a commercial traveler and passenger on the Newton, who says the Newton was coming down on the right-hand side "as close to the shore as she

could get." In view of the evidence of these eight eyewitnesses, three of whom were passengers and wholly disinterested, we think the weight of the testimony is clearly in favor of the appellants and against the appellees as to the positions of the vessels at the time of the collision.

In this view we are still further convinced by the fact that Dryden, the principal witness for the appellees, is quite effectively contradicted in his statements that Cahoon was, at the time he passed the tug, sitting in the pilot house smoking a cigar, while a deck hand was at the wheel. Under·these circumstances, after careful consideration of all the conditions, we are of opinion that neither the tug nor the barge were blameless in this collision. On the contrary, we do not believe proper measures were taken by the tug to bring the barge around the turn and keep it within reasonable limits of its side of the river. We do not think that the rudder of the barge was handled with such care as to prevent it from going across the river to such an extent as it did, in view of its master's and other testimony to the effect that its speed was very slow, likely as slow as a mile an hour, and "the motion of her head was almost unnoticeable." We therefore determine that the fault was the mutual one of the tug and barge, and that the loss should be apportioned equally between them; each being held responsible for the one-half thereof. The cause is therefore reversed, and remanded for further proceedings, to be had in accordance with this opinion.

Reversed.